Kelvin Daise
910 Emory Street
Wilmington, NC 28401
(919) 815-0252
Kkd9113@gmail.com



FILED BY _Mᴇᴇ_ D.C.

AUG 19 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

THE SOUTHERN DISTRICT

OF FLORIDA

KELVIN DAISE,

          Plaintiff,

vs.

BRITISH CONSULATE GENERAL MIAMI,

          Defendant

Case No.:

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF

## I.    NATURE OF THE ACTION

Now comes Plaintiff, Kelvin Daise who brings this action in enforcement of the United States' Constitution Title VI and Title VI of the Civil Rights Act of 1964 which prevents discrimination on the behalf of race, religion, sex, and national origin; the United States 5th Amendment due process and freedom of speech; the United States 14th Amendment freedom of liberty, due process, protection from unreasonable searches, and right to privacy; the State of Florida's Article I Section 2 of basic human rights; the State of Florida's Article I Section 4 Freedom of Speech; the State of Florida's Article I Section 5 right to assemble; the State of Florida's Article I Section 9 due process rights; the State of Florida's Article I Section 12 protections against government searches; and the State of Florida's Article 1 Section 23 protection of the plaintiff's right to privacy and request the assistance in asserting 22 U.S. Code § 1732 release from foreign imprisonment as British Consulate personnel have continued to injure the employment opportunity of the Plaintiff through various false statements preventing his pursuit of liberty and restricting his basic human right to freedom of contract and employment.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 1

## II.    PARTIES TO THE ACTION

Plaintiff, Kelvin Daise was a married resident of Orlando, FL at the time of the incident at issue and the Plaintiff has remained a resident of the State of Florida.

Respondent, British Consulate General-Miami is a foreign government organization with its principle place of business or main operations positioned in Miami, FL.

## III.    JURISTICTION AND VENUE

The Court has subject matter jurisdiction according to Title 28, Section 1332 of the United States Code (28 U.S.C. § 1332(a) which there exist complete diversity and the amount on controversy exceeds the required $75,000.

Venue is proper because the actions to the complaint have taken place in Miami, FL and the Court holds personal jurisdiction over the Respondent.

## IV.    ALLEGED FACTS

August 9th, of 2017, the Plaintiff was invited to interview for Criminal Justice Advisor Assistant position with the Miami based British Consulate General Office. The plaintiff's interviewers were Criminal Justice Advisor Hilary Ryan, Overseas Territories Director Larry Covington, and Human Resource Manager/Manager of Corporate Services Susan Owens. The interview consisted of various test questions regarding the plaintiff's competency, professional background, and motivation for diversity. Plaintiff received enormous praise from his interviewers.

Following Plaintiff's successful interview, Hilary Ryan informed the Plaintiff that he would be allowed to drive from Orlando 2-3 days a week for his job in Miami so that he could be able to spend time with his family. Hilary stated that staff never spent much time in the office so there was no necessity for him to do so. This was essential in Plaintiff's acceptance of the job offer.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 2

August 17th, 2017, The Plaintiff was offered a full-time weekday only temporary contract position with the Respondent as Criminal Justice Advisor Assistant to Hilary Ryan who oversees the legal department for the Overseas Territories (OT) for the British Consulate in Miami. The plaintiff accepted the position as an opportunity to grow professionally and practice legislative drafting.

The contract was stated as being from September 18th, 2017 until July 31st, 2018 as per the contract, the Plaintiff was required to: (a) satisfy the eligibility requirements for employment in the United States, (b) be successful completion of a reference check and (c) be successful completion of a security clearance based on a security investigation.

The Plaintiff had recently graduated from Florida A&M College of Law the prior year and was searching for an employment opportunity in which he could utilize the skills he had acquired over his three years of law school.

The Plaintiff was originally scheduled to begin his first day on September 18th as per the contract however, Hurricane Irma pushed back his start date to September 25th, 2017.

September 17th, 2017 on a non-workday Sunday, Hilary Ryan, who was scheduled to be Plaintiff's supervisor, delivered documentation to the plaintiff requesting that he review. This was prior to the start of his employment contract with the Respondent and should be considered a breach of the original employment contract given he was under no responsibility to begin work however his supervisor took advantage of the moment without informing the plaintiff of his employee rights.

Hilary's September 17th email provided the Plaintiff with his job description which details that he would be researching legal topics for legislative drafting; represent Crown Prosecution Services (CPS), the Foreign Commonwealth Office (FCO) OT stakeholders, and the Criminal Justice Advisor (CJA) during meetings and various events; arrange conferences and

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 3

training events for OT prosecutors; arrange travel and accommodation for the Criminal Justice Advisor; and manage the budgeting for travel, discretionary, and other project expenditures while maintaining their records.

Plaintiff had not yet received his employee handbook and was unaware of his employee rights. However, it was suggested that he begin work one week to his genuine start date which was not within the contract he signed with the Respondent.

During the time of the Plaintiff's employment offer, The Plaintiff was also working on acquiring his Fraud Examiners certification with the nationally recognized Association of Certified Fraud Examiners, and Plaintiff was studying for the State of Florida Bar Examination.

Plaintiff informed the Respondent of his aspirations during his August 9th interview and following his arrival to the British Consulate general's Office at 1001 Brickel Bay Drive on September 25th, 2017, no interviewer, nor the Plaintiff's supervisor Hilary voiced any opposition at the time.

As the Plaintiff began his work assisting Hilary R., OTD Director Larry Covington insisted that Plaintiff receive his office training from Mary Storie who was Larry's personal assistant.

Larry also insisted that Plaintiff get to know OTD employee Johnathan Snell because they both have a lot in common as African American men. Larry C. and Mary S. made claims that Johnathan was married however Johnathan never wore a wedding ring to work. One evening Johnathan introduced Petitioner to an African American woman with locks whom he claims to be his wife, but she also held no wedding ring. Plaintiff believes these actions of OTD personnel during their work hours and within their capacity as agents of the British Consulate were purposly fraudulent.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 4

Plaintiff was introduced to OTD staff Mary Storie, Heather McEntire, Jonathan Snell as well as special service police Steven whose wife is employed with the same Consulate office, a middle-aged English woman whose name the Plaintiff cannot recall however her husband is Peruvian and another middle-aged male whose wife is also employed with the British Consulate Miami. The office of the special police was closed from other officer personnel. However, they held the capability to perform various computer searches particularly within the British Consulate personnel.

The Consulate maintains their computer servers in the CPS/OTD office and internet connections were made through this server so all information sent from the office could be viewed by the Respondent.

Plaintiff was assigned a work phone (iPhone S), a Lenovo ThinkPad computer, a credit card for CPS expense maintenance.

Although Plaintiff was assigned a computer from CPS, Susan, Hilary, Steven, and British Consulate General David Prodger insisted that Plaintiff bring in his personal laptop in order to ease the difficulty of his expected tasks. Plaintiff took to the insistence and brought in his personal computer against his better judgment. Plaintiff would later discover that British Consulate personnel could view and change his personal computer information once he was connected to their office landline for internet use.

Plaintiff reasonably believes that the Respondent insisted Plaintiff bring in his computer so they would have access to his personal files during moments he would step out of his office. Plaintiff would later discover physical damage to his laptop and tracking information within his personal files on his personal laptop. Following his swift termination, the Plaintiff's laptop suddenly discontinued working during his residency in Washington State. The Plaintiff believes that given the similarity of the conduct of the State of Washington and British

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 5

Consulate, the fact that Petitioner was unable to secure any employment outside of these two substantially large organizations there is a strong correlation with the sudden illness of the Petitioner and his relocation to the State of Washington which is the true center of the COVID 19 virus. Ther city of New York was attacked by a foreign and domestic partnership to ruin the presidential opportunity of Donald Trump. Both Respondents conversed of the intention of a possible biological agent that may destroy Donald Trump's second presidential bid.

Plaintiff's supervisor in conjunction with Office Assistant Mary Storie recommended that the Plaintiff do his bar studying during his down time in the office. Or during the afterhours to avoid traffic.

Plaintiff observed that OTD staff (Mary Storie, Heather McEntire, Jonathan Snell) were expected to stay afterhours in order to complete assignments for the day.

During these afterhours working it was rumored that Mary Storie kept alcohol in her desk making "dark-and-stormy" cocktails for OTD staff which was against CPS policy of consumption of alcohol during work hours.

Often Mary S. would interrupt Plaintiff's studies insisting that he drink along with her in which Plaintiff declined. Mary S. grew suspicious because of Plaintiff's refusal to participate and began to take actions which would purposely sabotage the Plaintiff's studying and working efforts.

Mary would provide false or misleading information regarding accounting practices, British personnel contacts, and Mary would attempt to hide other important information necessary for the Plaintiff to perform his job duties.

October of 2017 Hilary Ryan requested that Plaintiff join her for a training that she was to perform in Jamaica however the Plaintiff was not comfortable with such trip because Hilary had not spoken about it during his first day on the job.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 6

The origin of Plaintiff's discomfort was the propositions made to the Plaintiff by various female staff in the office inquiring into the personal life of the Plaintiff against his request to respect his US Constitutional right to privacy. A married female staff member (Steven's wife) insisted that she join him to church so she could get the "black experience" Plaintiff responded his spirituality was sacred and not open for invitation, another married female staff member groped the Plaintiff during a business meeting at a local hotel, and other female staff members often insisted that the Plaintiff who was married at the time, to join them for afterhours drinking.

Plaintiff participated in one after hours drinking moment in which female staff made unsuccessful attempts to get the Plaintiff intoxicated suggesting visiting more bars. The Plaintiff instead chose to call his wife and speak of his workplace sexual harassment.

When Plaintiff began to refuse afterhours invites CPS and special police female staff began to inquire of the Plaintiff's residence and what days and times he would drive from Miami to Orlando to be with his family. Staff would make these inquiries each weekend . Consulate staff would make inference of their knowledge of the home in Central Miami where the Plaintiff resided during his workdays. Female staff often made suggestions they were in his "area" where he lived, but Plaintiff had not provided his overnight stay information to no staff member. Plaintiff felt his contract protected him from disclosing certain information. Plaintiff had become aware that female staff were following his locations without his consent or knowledge. Plaintiff received those actions threats to his livelihood.

CPS staff had collected all the Plaintiff's personal information via a security check form he completed following his first day on the job, but Plaintiff would later learn that no security check had been performed. Plaintiff discovered this after receiving many emails from CPS Washington, DC office requesting the status of Plaintiff's security clearance. Susan Owens

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 7

oversaw security clearances however she would often avoid updating Plaintiff of his security clearance status or provide misinformation.

Plaintiff would often witness Susan utilize her position with FCO and CPS to intimidate minority vendors in the Miami area forcing contract with the Consulate.

Plaintiff began to recruit various minority business within the Miami Florida area to service conventions, trainings, and celebrations. This benefited the Consulate because Susan Owens, Mary S. and Hilary R admitted the reductions in cost but improvement in services.

Foreign visitors to the Consulate praised the Plaintiff on his diligence and passion for his work.

The Plaintiff then began to obtain vendor contracts with top ranked local restaurants and businesses in the Brickel Miami area.

Staff members became upset and coordinated microaggressions towards the Plaintiff to cause further harm to his business relationships.

Hilary would contact business partners and inquire of the skills of the Plaintiff although she hired him to perform the job.

During a Late February audit, the plaintiff inquired of a training which Hilary claim to have performed on a trip to the Turks and Caicos Islands. Plaintiff recalled booking this trip through flights to Bermuda which was strange because Hilary took multiple flights to a different territory to stay overnight. Hilary could not recall the specifics of the training.

Plaintiff grew suspicious that Hilary Ryan was purposefully misappropriating funds for personal vacations as she often bragged about her scuba diving trips in the islands during these supposed trainings by showing pictures and she would spend most of her workdays search scuba equipment and diving locations. This was in violation of CPS, FCO, and OTD policy. Larry Covington and Johnathan Snell discovered Plaintiff's suspicions and began having

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 8

open conversations of other CPS and OTD staff who misappropriate funds for personal vacations admitting their own actions of regularly doing the same. Johnathan rarely was in the office and was often overseas on CPS and OTD funds.

Given the Plaintiff's position of managing the budget for Hilary's department on the behalf of CPS Plaintiff took to the task of finding the truth of Hilary'vacations. Through his investigations the Plaintiff discovered that Hilary, Larry Covnigton, Mary Storie, and other staff often misappropriated funds for personal trips to the overseas territories.

Following Plaintiff's discovery, Hilary began to harass the Plaintiff by loudly criticizing his work quality in the presence of other CPS staff. March of 2018 Hilary called the Plaintiff at his home 8am while he was with his wife and yelled cursing over the phone demanding that the Plaintiff relocate to Miami if he wanted to keep his job and required that he come into the office everyday even when other staff were not present. Plaintiff was forced to relocate spending excess funds and Hilary's demands cause strain on the Plaintiff's marriage. Hilary began to spread rumors that the Plaintiff was Haitian, and thus stealing CPS funds to enrich Haitian Americans which was false.

Plaintiff began to discuss his frustrations with other OTD staff of Hilary's insulting behaviors.

Susan Owens would later approach the Plaintiff and demand he return the work (CPS) credit card issued to him. Plaintiff's work credit card shows no financial discrepancies, and all purchases were made on the request and needs of Hilary Ryan. Plaintiff was aware that this demand was intended to degrade him publicly.

Plaintiff began to receive rude, inappropriate, and intimidating emails from Hilary Ryan and Susan Owens.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 9

1          One night after hours, Hilary was staying late rushing through work she had

2   placed aside earlier that day. Hilary demanded that the plaintiff stay and assist while "off the

3   clock" if he wanted to keep his employment.

4

5          Plaintiff then researched CPS and FCO workplace anti-bullying policies in order

6   to prepare to protect himself from Hilary's controlling behavior.

7          Plaintiff contact CPS anti-bullying hotline to report the discriminatory behavior of

8   Hilary. Plaintiff believes the representative he had spoken to was Danielle. Plaintiff explained

9   the afterhours demand in which he reported was a US labor law violation. The Plaintiff

10   questioned how a Criminal Justice Advisor could be comfortable breaking US federal laws. The

11   Plaintiff then disclosed that Hilary was misappropriating funds for personal travel, (including a

12

13   trip she took to Bermuda and transferred to Turks and Caicos Islands to go "diving" with her

14   work friend.) Plaintiff became aware of the high likelihood Hilary would place the blame upon

15   him for following her instructions when he noticed that Hilary was making attempts to alter her

16   expenses. Plaintiff then constructed a excel spreadsheet which would prevent Hilary from

17   altering numbers without changing the total spent. Hilary grew upset at the spreadsheet and made

18

19   false claims around the office that Plaintiff's accounting spreadsheet was incorrect and

20   unprofessional. No FCO, CPS staff agreed with Hilary's false assertion.

21          CPS anti-bullying representative contacted Hilary to warn her of the federal

22

23   violations, but no action was taken to relieve the Plaintiff. Plaintiff witnessed Hilary recruit other

24   females in the office to make claims of Plaintiff having poor work quality or exhibiting unruly

25   behavior which was false.

26          Hilary then coordinated with other female staff to upgrade the harassment of the

27   Plaintiff. Susan programmed all televisions within the office of the Plaintiff to play ongoing

28   news of the 2017-2018 #MeToo movement throughout the entire day assuring that Plaintiff was

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 10

aware of these news reports by asking questions of Plaintiff's personal feeling in violation of his privacy rights. Female staff would corner the Plaintiff with political questions which were in violation of CPS and FCO policy. Hilary attempted to coerce the Plaintiff into signing a Performance Improvement Plan which was false and inaccurate. This action was a violation FCO policy and United State law. Susan sent threatening emails with rude language while attaching other female office staff. Hilary and other female staff would attempt to force Plaintiff to comment on the marriage between Meghan Markel and Prince Henry often making statements such as "British aren't racist, we've just never had a black person come into the royal bloodline."

Plaintiff reported these behaviors to various human resource staff at the Miami and Washington, DC offices. The Consulate's Washington, DC placed Susan in charge of investigating Plaintiff's claims although there was a clear conflict of interest. Susan refused to report the investigation choosing to further oppress the Plaintiff.

Washington, DC later informed Plaintiff his contract was not through Hilary but with CPS and she would no longer be his direct supervisor. The office then placed Larry Covington as Plaintiff's supervisor, however Larry continued to allow Plaintiff's harassment.

Harassment included aggressive and overwhelming heckling in which FCO staff would offer baked goods as an apology to the Plaintiff. The Plaintiff discovered an attempt was made to hack into his Facebook page between April-June 2019. which he suspected was the work of Mary S. The Plaintiff realized that he had gained 20 pounds during this ordeal and his personal health began to suffer. The Plaintiff began to have issues with his asthma and his mother indicated that he may have diabetes.

The most damaging portion of the hostile workplace environment created by Hilary came on March of 2018. Hilary had stayed away from the office late February stating an unknown illness but she maintained contact with Larry C. One afternoon Larry explained his

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 11

sensitivity to being around anyone ill and it was advised by all office staff to stay home if ill in order to prevent the spread of diseases. Early March 2019 Hilary arrived in the office unnecessarily ill. Plaintiff witnessed abnormal growths around the corners of her mouth, Hilary exhibited difficulty breathing, bloodshot eyes, and she had a running nose she wiped with thin tissues. Hilary stated that her illness was in its third week. That day no CPS, FCO, OTD staff came into the office but the Petitioner.

Petitioner was the only staff in the office because Hilary had ordered the Plaintiff to stay in Miami and required him to come in the office every workday. The entire situation of Hilary being present while sick with the Plaintiff in office appeared as it had been planned. Hilary began to hover over the Plaintiff purposely sneezing on his computer and invading his personal space against his request she stay away. Hilary then wiped her nose and touched the shoulder of the Plaintiff. The next day when the Plaintiff arrived in the office Mary S. was unusually early. Mary began to ask the Plaintiff if he was ok, and that he looked like he may have caught what Hilary had. Plaintiff was suspicious of this assertion because Mary wasn't in the office the day prior to know that Hilary was sick. Mary then tried to coerce the Plaintiff into taking three small white pills that held no name. When the Plaintiff refused, Mary stuffed the pills in his desk and offered a "dark-and-stormy" to get Plaintiff's blood warm. Plaintiff declined. It is in the Plaintiff's reasonable belief that Hilary coordinated with office personnel to transfer Hilary's illness to the Plaintiff. The Plaintiff did fall ill and was unable to return home for days.

The Plaintiff reasonably believes that the illness in which Hilary contracted to him may have been the beginning stages of the illness which has affected this country as COVID 19. Plaintiff makes this assertion following his extensive studies on the unknown origin of the illness and its spread within the areas of his residence.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 12

Plaintiff's suspicions arose while watching a news story which documented that COVID 19 may have been within the United States since January of 2020. On January 12th, 2020 during a security job for a NFL Wild Card game the Plaintiff became unmeasurably ill after he was placed outside to "wand" entrants to the event and later stood outside to watch facility restrooms. Plaintiff began to exhibit a runny nose, migraines, and difficulty breathing. That night the Plaintiff contact his friend Claudia Fernandez as he was forced to leave the post early due to his illness. Plaintiff exhibited reoccurring hemorrhoids, continued muscle aches, difficulty breathing, loss of eyesight, and vomiting.

Lacking any viable health insurance coverage as the Plaintiff was recently forced into homelessness due to the illegal actions of the State of Washington, the Plaintiff was forced to endure this illness for three weeks in the same way the Plaintiff had witnessed Hilary R., and just as anyone who acquires the COVID 19 virus.

One morning, the Plaintiff was unable to walk or consume food and contacted an Uber in order to be hospitalized at a Tacoma, WA Multicare facility. Plaintiff was diagnosed with symptoms of an unusual flu which can be proven through documentation. During the Plaintiff's hospitalization, he was rendered fluids which took time for his recovery. It has been documented the first case of COVID 19 began in the Seattle's Chinatown area, a location often visited by the Plaintiff for his grocery shopping needs from December of 2019. The Plaintiff would later use the little funds from his security check to pay for a few days at a Quality Inn in the SeaTac, WA area. Plaintiff reasonably believes that his illness may have infected a an individual whom was a visitor to Wuhan, China which may have caused its spread abroad.

Plaintiff recalls a conversation he held during his office meeting with British Consulate General David Prodger. David expressed a need to acquire the trust of the minority community in the Miami, FL area. The Plaintiff informed David that he was introduced and

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 13

involved with the Miami Florida African American and Haitian community and Plaintiff offered to be a liaison for the Consulate to reach the minority community for business and outreach needs. David then began to rant about the grand opportunity of performing biological testing in the Miami area due to its tremendous diversity. The Plaintiff was floored by David's barbaric admission of unconstitutionally human testing in the United States by a foreign government. The Plaintiff would later share his conversation with close friends and then wife. Hilary and Mary S. began to question the strength of the Plaintiff's relations with various minority communities across the United States. Hilary was familiar of the Plaintiff's travel and involvement in minority communities from Philadelphia, Chicago, Washington, DC, and North Carolina. Often David and Hilary would confer together as if they were coordinating some plan and they both would randomly bombard the Plaintiff with questions of his knowledge as it pertained to minority migrations in the United States. Hilary would make attempts to have the Plaintiff disclose his Facebook friends and other non-work relationships.

Plaintiff's knowledge that the Respondent participated in a criminal act which resulted in his physical incapacitation and may be the cause of deaths around the entire world has caused an unmeasurable amount of physical and emotional distress resulting in reoccurring hospitalizations in attempts to unsuccessfully treat his mental health.

Following his illness Plaintiff returned to work and the harassment of female employees continued until the surprised termination of his contract one month to its actual close absent of any reason and in violation of his due process rights.

The day prior to Plaintiff's termination he was on the phone with his wife whom he had recently separated from due to the issues caused by the British Consulate's demands he remain in Miami, FL and Plaintiff's knowing concern for the physical safety of his family. The Plaintiff was located within the building which housed the Consulate during this conversation

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 14

with his wife. The Plaintiff informed his wife he would be seeking legal recourse for the Consulates violations of his Constitutional rights. When the Plaintiff returned to his desk office personnel avoided him as if they were listening to his phone conversation without his knowledge. Plaintiff now knows that his termination was preemptive of him seeking legal relief due to FCO and CPS legal violations.

Plaintiff suspects that his contract may have been a result of false information and that his employment was intended to spread a biological agent which would affect anyone he had encountered specifically African Americans and other people of color. Plaintiff suspects this because Hilary and Susan often openly made disparaging comments towards persons of African descent and other "exotic ethnicities" (Terms used by the Respondent) in the presence of the Plaintiff with the goal of cause mental harm via office microaggressions. Hilary and Mary S. would also make disparaging jokes about British encounters with Native Americans and their low biological resistance to sickness. Many Consulate staff persons referenced British historical biological warfare agents such as infected dead bodies flung across castle walls to obliterate "the enemy". However, staff never disclosed who this "enemy" was.

Prior to Plaintiff's termination, Larry C. encouraged Plaintiff to apply for the position of Justice, Security, and Governance Programme Manager via email. Petitioner applied and was later told by Larry that he was a top five (5) candidate from 70 applicants. Larry stated that he personally requested that Plaintiff's application be removed in violation of his due process rights and Larry instead chose to recommend his two female staff members who held lower qualifications than the Petitioner. When his candidates Mary S. and Heather McEntire failed to secure the opportunity, they began to upgrade their office harassment against the Plaintiff.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 15

The Plaintiff was expeditiously terminated from his position and Susan began to provide false statements to eventual employers on his background and work quality. Plaintiff was subjected to further harm and ill treatment due to those false statements that Susan provided to potential employers seeking a job reference. Plaintiff became aware of Susan's antics when a Washington State employer inform the Plaintiff, they were told he held no law degree which was false. Plaintiff was later separated from his wife due to his inability to obtain gainful employment.

The Plaintiff's hardships within the State of Washington was a direct result of the actions of the Respondent and the Plaintiff reasonably suspects that the illness Hilary infected him with may have been the cause of the current worldwide pandemic that has taken so many lives. The Plaintiff has taken the opportunity to study viruses following his illness. The Plaintiff is aware that an infection of a virus alters the individual's DNA thus strengthening any viral infection that derives from the infected. The Plaintiff reasonably believes that Hilary's virus pass to him strengthened his virus passed to others. The Plaintiff reasonably believes that his life is in danger from and has taken to avoid harm to his family. Following the news of the impact of COVID 19 on the African American community and its +200,000 body count, the Plaintiff had discovered the courage to come forward and pray the court will uncover the truth of the largest serial killer America has ever encountered in modern times.

Wherefore now the Plaintiff request that the Court recommend the Miami Attorney General to perform an investigation of the claims made by the Plaintiff of British involvement in the spread of COVID 19,

Find and declare that the Respondent has violated the United States' Constitution Title VI and Title VI of the Civil Rights Act of 1964.

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 16

Find and declare the Respondent has violated the United States 5th Amendment due process and freedom of speech;

Find and declare the Respondent has violated the United States 14th Amendment freedom of liberty, due process, protection from unreasonable searches, and right to privacy;

Find and declare the Respondent has violated the State of Florida's Article I Section 2 of basic human rights;

Find and declare the Respondent has violated the State of Florida's Article I Section 4 Freedom of Speech;

Find and declare that the Respondent has violated the State of Florida's Article I Section 5 right to assemble;

Find and declare that the Respondent has violated the State of Florida's Article I Section 9 due process rights;

Find and declare that the Respondent has violated the State of Florida's Article I Section 12 protections against government searches;

Find and declare that the Respondent has violated the State of Florida's Article 1 Section 23 protection of the plaintiff's right to privacy and

Plaintiff request that the court request the Court to assert 22 U.S. Code § 1732.

Dated this _19th_ of August, 2020.

Kelvin Daise
910 Emory Street
Wilmington, NC 28401
(919) 815-0252
Kkd9113@gmail.com

COMPLAINT FOR CIVIL PENALTIES AND JUDICIAL RELEIF - 17